# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 10, 2014

Lyle W. Cayce
Clerk

No. 13-10117

GEORGE MICHAEL WALL,

Plaintiff–Appellant,

versus

ALCON LABORATORIES INCORPORATED;
ALCON SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN;
ALCON LABORATORIES INC. SEVERANCE PAY PLAN,

Defendants–Appellees.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:11-CV-883

Before STEWART, Chief Judge, JOLLY and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:*

George Wall worked for Alcon Laboratories Inc. ("Alcon"), a major

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-10117

pharmaceutical company, from 1988 until resigning in 2010. He asked for, but was denied, a series of retirement and incentive-based benefits before he left Alcon to join another company. He sued Alcon and its benefit plans, seeking those benefits as well as damages stemming from alleged age discrimination and retaliation. The district court granted summary judgment for the defendants. Wall appeals, and we affirm.

## I.

## A.

The year 2008 marked the turning point in Wall's relationship with Alcon. That year, another company, Novartis, began its takeover of Alcon, and research and development ("R&D") was restructured as a result, leading to Wall's reporting to three supervisors at different times. Dr. Jean-Michel Gries (the first of the three) changed Wall's position from Senior Director to "Project Head IV, Pharm," similar to the reclassification of many others within the R&D Division, and then reassigned him to work under Dr. Michael Brubaker. Finally, in the latter part of 2009, Wall began working for the Therapeutic Unit Head for anti-infectives, Dr. David Stroman.

One of the projects Wall worked on then was for a product called Finafloxacin; for most of his claims on appeal, he relies heavily on that project and his claimed diminution of duties with respect to it. According to his evaluation, that project constituted only a small portion of his yearly objectives, and on his self-assessment for that year, he mentioned no diminution of duties and rated himself as "Fully Meets Expectations" in his 2009 self-assessment *vis-à-vis* the project.

Stroman delivered the rest of Wall's 2009 performance review. Wall gave himself a high rating, but Stroman rated him as only "Partially Met Expectations." As a result, Wall received a raise and bonus smaller than they

2

No. 13-10117

would have been had the review been better.

On November 2, 2010, eight months after receiving his 2009 review, Wall emailed Alcon's CEO and the VP of Human Resources ("HR") asking to discuss it with them. Two days later, Wall met with Vickie Stamp, the Alcon HR Director responsible for R&D, to discuss a potential appeal of his 2009 performance appraisal and a perceived lack of advancement. A week later (on the 11th), Wall met with Stamp again to discuss the possibility of retiring. According to Wall's deposition, Stamp assured Wall that she would "handle everything going forward" and advised him, "[D]on't piss them off[;] don't do anything."[1]

But Wall quickly accepted employment elsewhere instead. On November 11, 2010—the same day he says he met with Stamp to discuss the possibility of retiring—Wall was offered a job with Otonomy, a clinical stage biopharma company focusing on diseases of the inner and middle ear, as its Vice President of Product Development. He accepted the offer nine days later. His contract with Otonomy included higher base pay[2] and a guarantee that Otonomy would pay up to $50,000 in legal fees in the event of a dispute with Alcon about severance or retirement benefits.

Three days later (November 23), Wall emailed his supervisors stating his intention to retire on December 31. His last day in the office would be the 17th, at which point he would take two weeks' paid leave. He followed up with a letter on December 1 to Alcon's attorney, listing the reasons for his retirement and requesting benefits to which he believed he was entitled. On the 17th—his last day in the office before leaving for Otonomy—Wall received an email

---

[1] The deposition excerpt seems to suggest that Stamp was talking about his severance package when saying that she was "going to handle everything." In his brief, Wall describes Stamp as referring to claims he made alleging age discrimination.

[2] About $260,000 annually versus the $212,950 he made at Alcon.

3

No. 13-10117

from Alcon's in-house counsel, Tom Ryder, who said that his 2010 Performance review rated him as "Partially Met Expectations" and that Alcon had denied a portion of the benefits he claimed in his December 1 letter.

B.

In January 2004, Alcon permitted Wall to participate in the "Alcon Supplemental Executive Retirement Plan" or "ASERP," an employee benefit plan under the Employee Retirement Income Security Act of 1974 ("ERISA"). ASERP benefits are calculated based on the employee's average compensation. Employees must agree to various covenants as a condition of receiving ASERP benefits. Relevant to this appeal are the covenants not to disclose Alcon's confidential information and not to compete. The latter, which is the more important of the two, states:

> [A]s a condition to receipt of ASERP Benefits, for a period of five (5) years following termination of employment, each Participant will not . . . carry on any business of, or be engaged in, consult or advise, . . . or permit his name or any part thereof to be used by, any person or entity engaged in or concerned with or interested in any business carried on, anywhere in which the Alcon Affiliated Companies carry on their business, ***which competes with the products manufactured and sold or services provided by the Alcon Affiliated Companies (the "Business").*** If the Participant violates the Covenant Not to Compete set forth herein, he or she shall forfeit all ASERP Benefits.

The benefits are administered by the ASERP Committee, composed of Alcon's CEO and CFO.

After Alcon received Wall's December 1 request for ASERP benefits, Ryder emailed Wall asking for additional information, including Wall's new company and the nature of his duties. That information was necessary for the ASERP Committee to determine whether Wall's post-Alcon employment would violate the non-compete or confidentiality covenants.

4

No. 13-10117

Despite those covenants and Wall's acceptance of a position with another pharma company a month earlier,[3] Wall refused to provide the requested information. On December 22, he sent an email stating that Alcon's "request for more specific detail regarding my potential job opportunities appears to be beyond the scope of what is reasonable and may violate my obligations of confidentiality with other entities."

Alcon gave Wall three additional chances to provide the requested information. Finally, on January 21, 2011, Wall's counsel responded by stating that Wall had accepted employment with Otonomy but that Otonomy was not a competitor because it was a start-up company.

In June 2011, Alcon wrote to Wall's counsel again, noting that Otonomy had issued a press release announcing Wall's hiring, citing his previous experience at Alcon, and naming several Alcon products. An examination of its website then revealed that Otonomy was developing medications for ear infections, which Alcon believed were "clearly aimed" at developing products that could compete with those sold by Alcon. Accordingly, the ASERP Committee denied Wall's ASERP benefits and informed Wall that he had sixty days to request a review and to provide any material he desired the Committee to include in its review of the claim.

Wall did appeal, denying that his employment with Otonomy violated the covenant not to compete. On September 27, 2011, Alcon affirmed its denial of ASERP benefits on the grounds that Alcon and Otonomy were both competing in the market for treatments of Otitis Media (an ear condition).[4]

---

[3] This was also despite the fact that he had just extracted from Otonomy a promise to provide up to $50,000 in legal fees explicitly related to a potential ASERP fight with Alcon.

[4] The Alcon product was called CIPRODEX; Otonomy's developmental drug was called OTO-201.

5

No. 13-10117

C.

During the course of his employment, Wall was annually awarded Restricted Stock Units or "RSUs," which vest on the date set forth in the Award Certificate. After fulfilling the vesting schedule, RSUs convert to shares of Alcon stock that each participant can sell or retain as an investment. To obtain his RSUs, Wall was required to comply with the terms of the award agreements. The key terms are the Change-of-Control provision in the 2009 Restricted Stock Unit Award Agreement and §§ 7.7 and 7.9 of the 2002 Amended Alcon Incentive Plan.

The Change-of-Control provision is an acceleration clause triggered by a change of control of the company, as occurred when Novartis became the majority shareholder in Alcon on August 25, 2010:

> [U]pon a Change-of-Control of the Company pursuant to Section 2.4 of the Plan and if the Participant's employment with the Company or successor is terminated without Cause or by the Participant with Good Reason six months preceding to two years following a Change of Control, all Restricted Stock Units granted the Participant under this Agreement will vest . . . at the Participant's termination of employment . . . .

> For this purpose, "Good Reason" means the occurrence of one or more of the following conditions:

>> (1) A material diminution in the Participant's base compensation.

>> (2) A material diminution in the Participant's authority, duties, or responsibilities.

>> (3) A material change in the geographic location at which the Participant must perform services.

> The Participant must provide written notice to the Company or successor, as applicable, of the existence of one or more of these enumerated conditions within 90 days after the existence of the condition. The Company or successor will have at least 30 days following its receipt of such notice to remedy the condition and thus

No. 13-10117

eliminate the Good Reason.

The key clauses are the requirements that the termination by Wall be for one of the "Good Reason[s]" listed and that Alcon would have thirty days to cure.

In his December 1 letter and on appeal, Wall does not claim that the first or third listed "good reason" applies but only that he suffered a "material diminution in [his] authority, duties, or responsibilities." He proffers two such diminutions: (1) that he was prohibited from publishing scientific articles and (2) that Dr. Alani, the VP of Formulation, was placed in charge of formulation work of the Finafloxacin project. Alcon responded in its December 17 letter that Wall had failed to provide a good reason for his retirement and thus was entitled only to one-third of his 2009 RSUs and none of his 2010 RSUs.

The dispute over the RSUs and ASERP benefits continued into the following summer, and on July 28, 2011, Wall sent a letter appealing Alcon's determination that he had not resigned for good reason. Ryder responded for Alcon on September 27, rejecting the appeal on the ground that "even if Dr. Wall's authority, duties or responsibilities were diminished, . . . any such diminishing was not 'material' as that term is used in the [RSU Award Agreement]."

D.

Wall sued, alleging four theories of recovery relevant to this appeal:

(1) that the ASERP Committee arbitrary and capriciously denied him benefits owed him under Alcon's ERISA plan ("ERISA claim");

(2) that Alcon, in failing to award 100 percent of his outstanding RSUs and SARs, breached its contract ("Contract claim");

(3) that Alcon constructively discharged him because of his age, in violation of the ADEA, 29 U.S.C. §§ 621-34 ("Age Discrimination claim"); and

7

No. 13-10117

(4) that Alcon constructively discharged him in retaliation for his opposition to its discriminatory practices, in violation of the ADEA, 29 U.S.C. § 623(d) ("Retaliation claim").

The district court granted summary judgment for the defendants.

## II.

Wall's ERISA claim comes down to one question. That sole inquiry is whether the ASERP Committee's determination that Wall's employment with Otonomy violated the non-compete clause was arbitrary and capricious.

## A.

We most recently described the standard of review for summary judgment in appeals of a decision of an ERISA administrator in *Schexnayder v. Hartford Life & Accident Insurance Co.*, 600 F.3d 465, 468 (5th Cir. 2010):

> We review the district court's grant of summary judgment in an ERISA case *de novo*, applying the same standard as the district court. Because the Plan gave [the ERISA administrator] discretionary authority to determine eligibility for benefits as well as to construe the Plan's terms, we review [the administrator's] denial of benefits for an abuse of discretion. A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial. "If the plan fiduciary's decision is supported by substantial evidence and is not arbitrary or capricious, it must prevail.

(Citations and internal quotation marks omitted.) Our "review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness—even if on the low end."[5]

---

[5] *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 247 (5th Cir. 2009) (citation and internal quotation marks omitted); *see also Threadgill v. Prudential Secs. Grp., Inc.*, 145 F.3d

No. 13-10117

The ASERP Plan included a five-year non-compete covenant that provided, in relevant part, a promise not to work for a company "which competes with the products manufactured and sold or services provided" by Alcon. The ASERP Committee denied Wall's claim because it found that he had violated the covenant by accepting employment with Otonomy, which was producing an allegedly competing treatment for otitis media, an ear condition.

## B.

The district court granted summary judgment after hearing oral argument at the pretrial conference, concluding that the ASERP Committee's finding that Wall had violated the non-compete was not arbitrary and capricious, even if "[o]ther people might have made a different decision." Wall presents two arguments for reversal. First, he contends that the clause is written in the present tense ("competes"), whereas the allegedly competing product was a product in development, not for sale at the time Wall joined Otonomy. At oral argument, Wall's counsel emphasized that the non-compete covenant requires that Otonomy be "manufactur[ing]" a product in order to violate the non-compete covenant. Second, Wall argues that the product does not compete with anything Alcon produces because CIPRODEX (Alcon's product) was approved by the FDA only to treat *acute* otitis media, but OTO-201 (Otonomy's product) is being developed to treat *chronic* otitis media.

Alcon responds to the first contention by saying that it might have merit if Alcon were only in the business of sales, but it is also engaged in researching new drug treatments. Accordingly, the Committee sensibly interpreted the

---

286, 295 (5th Cir. 1998) (applying this deferential standard of review in a dispute over the proper interpretation of an ERISA agreement).

non-compete clause as prohibiting a participant from engaging in the development of products that would conflict with Alcon's business when brought to market. As to the second, Alcon responds that "[t]he ASERP Committee rejected this hair-splitting argument, since Wall admitted in his appeal that both OTO-201 and [CIPRODEX] were intended to treat the same basic condition, Otitis Media." Based on the then-extant record, Wall's position would require the Committee "to speculate on the potential future uses, treatments, conditions, method of dispensing, and clinical settings in which, and for which, a medication currently in development may be used once it is ultimately brought to the marketplace."

Alcon has the better of the argument. The contract does not in fact require that a competitor be manufacturing anything. Although it anticipates that the competitor be competing with "the products manufactured and sold or services provided by Alcon," that only requires that *Alcon*, not the competitor, be producing something. The portion of the clause that is relevant to Otonomy's conduct is much broader: The prohibition is on Wall's "engag[ing] in, consul[ting] or advis[ing] . . . or permit[ting] his name . . . to be used by" any company—such as Otonomy—that is "concerned with or interested in any business . . . which competes with products" manufactured by Alcon. Otonomy is in the developmental stages of a drug treating otitis media, and Alcon manufactures a drug treating otitis media. It can hardly be said that Otonomy is not "engaged in" or "concerned with" or "interested in" business that competes with products manufactured and sold by Alcon.

Wall's interpretation of the contract fails for another reason. Wall, by profession, is a researcher. Almost by definition, any work he would ever do on a product would be in its developmental stage. By his interpretation, he could never, then, violate the non-compete clause of the ASERP. But that would be an absurd rendering of the contract.

No. 13-10117

Ultimately, we need not resolve the "true" interpretation of the contract. Because Wall's arguments are hair-splitting, this is a case in which we must defer to the ERISA administrator: The Committee's decision was not arbitrary and capricious.

Wall's behavior betrays the reasonableness of the Committee's inter-pretation. After his "retirement" from Alcon, Wall—despite the existence of the non-compete covenant and the $50,000 in legal fees he extracted from Otonomy in contemplation of an ASERP fight—refused to respond to Alcon's request that he divulge the entity for which he was working. Alcon in fact provided four opportunities over the course of several months for Wall to pro-vide information concerning his new company, and only on the last attempt did Wall finally comply.

Furthermore, when Wall signed his employment contract with Otonomy, he extracted a promise for $50,000 in legal fees should Alcon dispute whether he had violated the non-compete clause. (His contract with Otonomy, in fact, explicitly references the non-compete clause.) If Wall truly believed that any finding that he was violating the non-compete clause was unreasonable, that promise was a curious extract from negotiations. More likely, the promise reveals at least the reasonableness of the Committee's non-compete determination.

## III.

Wall's claim for RSUs is more complicated than his claim for retirement benefits, despite being a routine contract claim divorced from the labyrinth that is ERISA. It involves four questions and requires a two-step inquiry.

First, we must decide whether § 4.7 or § 4.9 of the Amended 2002 Alcon Incentive Plan governs the parties' 2009 [RSUs] Award Agreement. If § 4.7 applies, we must reverse and render in favor of Wall because § 4.7 requires

automatic vesting of Wall's RSUs upon retirement. If § 4.9 applies, we have to consider three questions, a negative to any of which compels us to affirm summary judgment for Alcon:

(1) Did Wall retire for a "good reason?"

(2) Did Wall satisfy the thirty-day notice requirement?

(3) Did Wall violate the non-compete clause?

## A.

The threshold inquiry on the contract claim is whether § 4.7 or § 4.9 applies. To understand the significance of this decision requires some context.

Two different agreements govern Wall's RSU award. The first is the "RSU Award Agreement for Restricted Stock Units awarded in February 2009 to U.S. participants under the Amended 2002 Alcon Incentive Plan" ("Award Agreement"). The second is the Amended 2002 Alcon Incentive Plan ("the Plan"), referenced in the title of the first agreement. The Plan is a general umbrella contract covering any number of benefits agreements between Alcon and its employees. The Award Agreement is a subcontract within the Plan's umbrella specifically governing Wall's 2009 RSU award and includes numerous terms not included in the Plan. By the terms of the RSU Award Agreement, any conflict between the RSU Award Agreement (the sub-agreement) and the Plan (the umbrella) is resolved in favor of the latter.

In a nutshell, the fight between the parties is over which contract—the Award Agreement or the Plan—provides the relevant schedule for accelerated vesting of RSUs. The answer depends on whether the two contracts provide conflicting rules for accelerated vesting, a question whose answer depends on whether the Award Agreement is governed by § 4.7 or § 4.9 of the Plan.

In the Award Agreement, there is a "Change-of-Control" provision that describes an intricate plan governing accelerated vesting of RSU awards upon

a change of control (as when Novartis completed its takeover).  It provides that Wall's RSUs would automatically vest at retirement *only if* he voluntarily retired for a listed "Good Reason" and gave Alcon thirty days to remedy the reason.  Wall maintains that the Change-of-Control provision of the RSU Award Agreement conflicts with § 4.7 of the Plan, which provides for immediate vesting of "Restricted Stock" upon retirement:

> In case of Participant's Retirement, the Restriction Period applicable to all shares of Restricted Stock expire and such shares shall become vested and nonforfeitable at the earlier of (a) Retirement, or (b) the end of the Restriction Period.

Alcon responds that there is no conflict between the Plan and the RSU Award Agreement because § 4.7 does not apply to the award of restricted stock *units* (which are not actually stock, as contemplated by § 4.7).  Instead, the Award Agreement falls under § 4.9 of the Plan (for "Other Stock-Based Awards"), which does not provide for a vesting period—and that is why the Award Agreement includes an elaborate vesting mechanism.  The district court did not address the § 4.7-versus-§ 4.9 question in its written order granting summary judgment, presumably because the question was discussed at such great length at the pre-trial conference, where the district court ultimately concluded, correctly, that § 4.7 did not apply.

Wall relies heavily on two "gotcha" moments in depositions, but he loses some credibility in doing so.  One such moment is from a deposition of Tom Ryder, Assistant General Counsel for Alcon, who was asked, "Were the shares issued under—were Dr. Wall's shares issued under the restricted stock award?"  Ryder responded, "I don't know if it was restricted stock award, I assume that's correct."  The district court's pithy reply sums up the amount of attention this argument is due:

> The Court: Is that what you're relying on?

No. 13-10117

[Wall's Counsel]: Correct, Your Honor.

The Court: My goodness.  You can do better than that.

The second deposition was of CEO Kevin Buehler, who, in his deposition, was asked, "These RSUs that we had been discussing earlier are annual incentive awards; is that correct?"  He responded, "Yes, sir."  Of course, Buehler is not a lawyer, and the question was not asked in the context of whether the carve-out of "annual incentive awards" as used in § 4.9 applied to Wall's RSU award.

Alcon, at any rate, has consistently argued that § 4.9 applies to the RSU Award Agreement and, hence, that the latter's vesting provisions govern. Alcon claims that § 4.7 of the Plan governs the award of shares of *restricted stock*, not the award of *restricted stock units*.  Restricted stock is essentially like cash—the recipient immediately owns the stock upon receipt of the award (or the certificate).  A unit, by contrast, is an unfunded promise to deliver stock in the future if certain conditions are met; one does not own any stock whatsoever by virtue of being granted a stock unit.

Alcon has the better of this argument, as recourse to either of the relevant provisions in context reveals.  Section 4.7 plainly contemplates the award of stock that the recipient owns immediately, the "restricted" adjective signifying that there are restraints on the recipient's ability to alienate the stock that he then unequivocally owns:

> 4.7 Restricted Stock.  A Restricted Stock Award is the *transfer of shares* to an Employee, subject to such terms and conditions as the Board shall deem appropriate, including, without limitations, *restrictions on the sale, assignment, transfer* or other disposition of such shares . . . .

And upon failure of the recipient to abide by the restraints on alienation during the Restriction Period, the stock is forfeited or required to be sold back to the company.

14

Even the Acceleration Clause (§ 4.7(d)) is inapposite once one realizes the difference between RSUs and restricted stock. Section 4.7((d) provides that the "Restriction Period"—which is the period in which an owner of restricted stock cannot alienate his shares—will expire, and the shares will become non-forfeitable once the Restriction Period ends or the recipient retires. That, of course, is not what this squabble is about; Wall and Alcon are not fighting over the applicability of any Restriction Period on Wall's ability to alienate shares that he already owns. Rather, he is claiming that his RSUs should have *been awarded* upon his retirement.

Section 4.9, though brief, also contemplates stock unit awards (as distinct from awards of restricted shares) explicitly:

> The Board may, from time to time, grant to an Employee Awards . . . under Section 4.9 that consist of, or are denominated in, payable in, valued in whole or in part by reference to, or *otherwise based on or related to, shares*. These Awards may include, among other things, shares, Restricted Stock Options, phantom or hypothetical shares *and share units*.

Finally, the course of dealings between Wall and Alcon Labs manifests the parties' intent to be governed by the Award Agreement's vesting period. First, the Award Agreement suggests that the parties did not understand § 4.7 to govern the RSUs' vesting. It would have been strange to draft such a careful, intricate, and balanced vesting schedule for RSUs in the Award Agreement if either of the parties thought that such an enterprise would be a waste of time. Second, when he announced his resignation, Wall would not have gone to such great lengths to ensure that he met the requirements of the Award Agreement if he did not believe it would govern the vesting of his RSUs.

Because § 4.9 governed the RSU Award Agreement, we have to apply the latter's vesting schedule. That schedule provides that Wall was entitled to accelerated vesting of his RSUs if he left Alcon for "Good Reason," as that

phrase is defined by the Award Agreement, but only if he provided notice of the good reason to Alcon, which would then have "at least 30 days following its receipt of such notice to remedy the condition and thus eliminate the Good Reason."

## B.

The first of two reasons the district court gave for entering summary judgment for Alcon was that Wall had failed to fulfill his agreement to give Alcon thirty days to remedy the "good reasons" that had prompted his retirement. The district court was correct, and we affirm its summary judgment on this basis.

The Award Agreement provides the following notice provision:

> The Participant must provide written notice to the Company or successor, as applicable, of the existence of one or more of these enumerated conditions within 90 days after the existence of the condition. The Company or successor will have at least 30 days following its receipt of such notice to remedy the condition and thus eliminate the Good Reason.

Under this provision, Wall was obligated to provide written notice and an opportunity for Alcon to remedy in order to maintain that his resignation was for "Good Reason," entitling him to accelerated vesting of his RSUs. This he failed to do.

Even if we assume, *arguendo*, that Wall's December 1 letter gave notice of a good reason entitling him to sever his relationship with Alcon, by his own communications he made clear (twice) that December 17 was going to be his last day and that he had no intention of returning to Alcon after the 17th. Moreover, he had already accepted, a month earlier, Otonomy's offer (with a higher base salary and a VP-level position) and had negotiated for $50,000 in expenses for contemplated litigation over retirement benefits with Alcon. Wall

16

No. 13-10117

never offered to remain at Alcon if only it would address his concerns, nor does he even present any summary judgment evidence that, in fact, he *would* have stayed at Alcon (and thereby breached his contract with Otonomy) had they remedied his good reasons.

## IV.

We have considered Appellant's remaining arguments, including those pertaining to his age-discrimination and retaliation claims, and have reviewed the relevant portions of the record.  Those arguments are unavailing.

The summary judgment is AFFIRMED.